UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

TOMMY D. SHARP                                                                                            PLAINTIFF

v.                                                          CIVIL ACTION NO. 3:09-CV-429-S

AKER PLANT SERVICES GROUP, INC.                                    DEFENDANT

### MEMORANDUM OPINION

This matter is before the court on the motion of Aker Plant Services Group, Inc. ("Aker") for summary judgment (DN 20). Plaintiff Tommy D. Sharp ("Sharp") has responded (DN 23), and Aker has replied (DN 26). For the reasons set forth herein, Aker's motion will be **GRANTED**.

### BACKGROUND

In January 2009, Sharp was laid off from his position as a senior designer in Aker's Electrical and Instrumentation ("E&I") division. Sharp, who was 52 years old at the time of the layoff, claims he was terminated because of his age.

Sharp was one of five members of Aker's nine-member DuPont Louisville Site Team[1] laid off as part of a larger reduction in force at Aker. Planning for the reduction began in late 2008, when Aker's Mid-America Regional Manager, Steve Dellinger, asked Michael Hudson, the Louisville Site Team, to fill out a "forced ranking" form for his team members. Hudson was instructed to rank each employee's leadership skills, communication skills, growth potential,

---

[1] Aker provides a number of services, such as engineering and construction services, to its clients. E.I. du Pont de Nemours and Company ("DuPont") was one such client, and Aker maintained a team of employees (a "Site Team") at DuPont's Louisville location. The Louisville Site Team consisted of four E&I designers, three piping designers, an estimator/scheduler, and a drafter.

adaptability, and unique knowledge as compared to the other employees on the team. Because there were nine members of the Louisville Site Team, Hudson ranked each employee in each area on scale from one to nine (with a score of nine indicating that the employee was the best in a particular area). These scores were then averaged to reach a final "overall rating." Hudson was also instructed to provide comments about the employees he ranked. Sharp received an overall rating of 3.6 in this survey, the second-lowest score of the E&I designers, as well as the second-lowest score overall. In the "comments" section, Hudson wrote, "Tom is a solid designer [sic] usually keeps his head down and pays attention to his work but needs to follow up on needed information, not wait for it."

Dellinger and Scott Atkins, Aker's Senior Manager of Human Resources, reviewed the forced ranking sheets Hudson submitted. They then apparently asked Hudson (and other supervisors whose teams were targeted for the reduction in force) which employees were necessary to continue operations and which should be let go. Atkins states that he then reviewed these recommendations with next-level supervisors and compared them to the forced rankings. Atkins. Aff. (DN 20-5) at ¶ 18, and assessed any "mitigating factors" that might warrant retaining a lower-ranked employee over a higher-ranked employee. *Id.* Finally, Atkins created an "Impact Analysis" that checked the layoff for "disparate impact" on certain groups. *Id.* at ¶ 19. Atkins concluded that there were no disparate impact issues with the individuals who were to be released. *Id.*

Sharp and the lowest-scoring member of the E&I design team, who was 57 years old, both received layoff notices. A 58-year-old piping designer, who had scored the lowest among the Louisville piping designers, was also laid off. Finally, a 39-year-old drafter and 37-year-old

estimator/scheduler were released. Both employees had scored well on the forced ranking, but their positions were eliminated as part of the reduction in force. The two designers selected to remain on the E&I team were Larry Ash, the 55-year-old lead designer, who had scored a 5.6 on the forced ranking, and Bill Kirkpatrick, a 44-year-old designer who had scored a 7.8 on the ranking, the highest of any member of the Louisville team. The two designers selected to remain on the piping team were 52 years old and 55 years old. Hudson, approximately 57 years old, also retained his position as Site Team Manager.

Sharp was notified of the layoff decision on January 15, 2009. On January 19, 2009, Sharp approached Hudson, ostensibly to ask him for a letter of recommendation. Unbeknownst to Hudson, Sharp was recording the conversation with a device he had hidden in his pocket. During the discussion, Sharp broached the subject of Kirkpatrick, who had apparently been receiving training to eventually replace Ash as lead E&I designer. Sharp's recording device captured the following exchange:

> Sharp: It just concerns me that someone was brought in younger, specifically to take Larry's place. Like you said, it was unfortunate for John [the other terminated E&I designer] and myself.
>
> Hudson: It is the fact that he is younger.
>
> Sharp: Well yeah, it is the fact that he is younger.
>
> Hudson: Because you, and I and Larry, we're all the same age.
>
> Sharp: Yeah.
>
> Hudson: And you're gonna bring in the guy that's going to give you [sic] additional ten, twelve years or whatever, after, you know, we're gone or if Larry's gone.
>
> Sharp: Yeah.

Hudson: You know because we are, well, I don't know, maybe I shouldn't be using the term age, it's probably not HR, the right way to say it. If I take somebody that is the same age as Larry, like you or John, and train them. Well, we spend a lot of time and effort to train them, and they may turn out to be just as good as Larry, but then you are the same age and you can retire.

Sharp: But I guess that's true for anyone though, I mean . . .

Hudson: Oh yeah.

Sharp: Bill could, I mean, hit the lottery and leave anytime too.

Hudson: Sure, absolutely. Yeah.

Sharp: So I guess I find it a bit unfair, or unfortunate.

Hudson: Well, you want to find that person that's five or ten years into their career that may have the tools to come along and be the next department head, or lead designer or whatever, and bring them along, that's the idea.

[Hudson then discusses the layoff of the Louisville Site Team estimator, who had been trained but was released because his position was eliminated.]

Tom: Yeah, like I said Thursday, you know, it concerned me when you all brought Bill in, in the first place, you know, and said, you know, this is going to be Larry's replacement. Because I saw a definitely [sic] change in my status when you all did that. I mean cause I was checking Larry's packages, I felt like I was the number two guy, at that point, and, you know, at some point, you know, I stopped checking Larry's packages, because Bill was being groomed to do that.

Hudson: Yeah, and it was a matter of not that your ability all of a sudden became any less.

Sharp: Right.

Hudson: It's a matter of his being available, and what I was told was his abilities and everything was [sic] good from what they were telling me at the office . . .

Sharp: Working towards grooming him.

Hudson: . . . and his age, and where he was in his career, just all everything just aligned right, that he was [sic] a good spot in his career to do that.

Sharp: Yeah.

Hudson: And so it worked out well, for that.

Sharp: Yeah.

Hudson: And again, it's not that your abilities all of a sudden ceased to exist, or got worse, or anything like that, we just, I hate to keep repeating myself, but we're all of the same age and we're all going to retire and I had an opportunity to bring the next generation in, so that's what we decided to do.

Conversation Transcript (DN 20-7), at 2.

Sharp's employment with Aker officially ended on January 30, 2009. On June 3, 2009, he filed this action in Jefferson County, Kentucky Circuit Court, claiming that his termination violated the age discrimination provision of the Kentucky Civil Rights Act (KCRA). On June 17, 2009, Aker removed the action to this court on diversity grounds.[2] It now moves for summary judgment.

## ANALYSIS

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when there is "sufficient evidence on which the jury could reasonably find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party must present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz.*

---

[2]Aker is a Delaware corporation with its principal place of business in Texas. Sharp seeks compensatory damages and attorneys' fees, which are mandatory under the KCRA. *See* KRS § 344.450 ("The court's order or judgment shall include a reasonable fee for the plaintiff's attorney of record . . ."). Sharp claims in his complaint that he earned approximately $80,000 per year at the time of his termination; presumably, any damages he seeks would be equal to at least that much. No motion to remand has been filed, and the court is satisfied that the jurisdictional requirements for diversity of citizenship and the amount in controversy have been met.

*v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). The evidence presented must be construed in the light most favorable to the non-moving party. *Blakeman v. Mead Containers*, 779 F.2d 1146, 1150 (6th Cir. 1985).

Sharp raises only one claim in his complaint: that his termination violated the KCRA. Under the KCRA, it is unlawful for an employer to fail or refuse to hire, discharge, or otherwise discriminate against an individual with respect to compensation, or the terms, conditions, or privileges of employment because the individual is 40 years old or older. *See* KRS § 344.040(1). Age discrimination claims brought under the KCRA are analyzed in the same manner as claims brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393–94 (6th Cir. 2008). An employee may support his age discrimination claim by either direct or circumstantial evidence. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)).

**1. Direct Evidence**

Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler*, 317 F.3d at 570 (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Aker argues that the statements Hudson made during the conversation constitute such evidence because they show Hudson asserted that the organization was "going younger" and "had, at least in his own mind, a succession plan in place." Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12.

Statements that indicate that an employer is making an employment decision based on stereotypes, such as the idea that all older employees are less competent or productive than younger employees, may constitute direct evidence of discriminatory animus. *See Schiltz v. Burlington Northern R.R.*, 115 F.3d 1407, 1411–12 (8th Cir. 1997) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). However, statements that merely indicate that an employment decision was based on factors that happen to be correlated with an employee's age do not constitute direct evidence. *See id.* Here, Hudson's comments do not indicate that Sharp's dismissal was due to his age alone. Rather, Hudson's comments indicate that one of the considerations in hiring, training, and ultimately retaining Kirkpatrick (instead of Sharp) may have been Kirkpatrick's potential longevity with the company and his ability to assume a leadership role upon Ash's retirement.

The Eighth Circuit Court of Appeals addressed the legal effect of statements similar to Hudson's in *Lee v. Rheem Mfg. Co.*, 432 F.3d 849 (8th Cir. 2005). In *Lee*, the court held that an interviewer's remarks that "things have changed a lot" and that the employer was trying to "plan for the future," as well as questions about how long the applicant intended to work for the company, were not direct evidence of age discrimination. *Id.* at 853. Although the company eventually rejected the 63-year-old plaintiff in favor of a 39-year-old applicant, the court held that the remarks about "plan[ning] for the future" and the questions about the applicant's contemplated tenure reflected legitimate business concerns about the plaintiff's expected years of service rather than discriminatory animus. *Id.* While Sharp attempts to distinguish his case from *Lee*, his arguments do not undermine the premise that remarks that reflect age-correlated considerations are not direct evidence of discriminatory motives, nor that the amount of time an

employee could be expected to spend working for a company is a legitimate business concern. Accordingly, we conclude that Sharp has failed to provide direct evidence of age discrimination.

**2. Circumstantial Evidence**

Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler*, 317 F.3d at 570 (citing *Kline*, 128 F.3d at 348). When analyzing age-discrimination claims based on circumstantial evidence, courts in the Sixth Circuit use the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792. *Geiger v. Tower Automotive*, 579 F.3d 614, 622 (6th Cir. 2009). Under the *McDonnell Douglas* test, a plaintiff must first make a prima-facie case of discrimination by showing (1) that he was a member of a protected class; (2) that he was discharged; (3) that he was qualified for the position held; and (4) that he was replaced by someone outside of the protected class. *Id.* If, as in this case, the termination was the result of a reduction in force, the plaintiff satisfies the fourth element by providing "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* (quoting *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990)). If the plaintiff meets his prima facie burden, the employer must then articulate a legitimate nondiscriminatory reason for the adverse employment action. *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 265 (6th Cir. 2010). If the employer does to, the burden shifts back to the plaintiff to show that the employer's explanation was a "mere pretext" for age discrimination. *Id.*

Aker does not dispute that Sharp has met his burden with respect to the first three elements of his prima facie case. However, it argues that he has failed to present any additional

direct, circumstantial, or statistical evidence indicating that his discharge was for an impermissible reason. Sharp repeatedly contends that he has provided evidence from which a jury could conclude that his termination was motivated by his age. He argues that the rankings were overly subjective; that he was denied opportunities for additional training or advancement, such as the chance to take over some of Ash's duties, that were offered to Kirkpatrick; and that Hudson's comments indicate that Aker intended to "go younger."

Sharp's arguments are unavailing. Although the rankings were subjective, Sharp has not provided evidence to show that the rankings were not an accurate reflection of his job performance. Indeed, he does not protest the accuracy of the overall evaluation of his work. He has also not provided evidence to show that the opportunities provided to Kirkpatrick but denied to him were the result of impermissible, discriminatory motives. "[T]he mere fact that a younger employee . . . receives better treatment than an older one is insufficient to carry the burden of proof" in an age discrimination case. *Dabrowski v. Warner-Lambert Co.*, 815 F.2d 1076, 1078 (6th Cir. 1987). Further, as explained above, Hudson's comments implicated an age-correlated considerations, but did not reflect a discriminatory motive behind the treatment Sharp received. Finally, as Aker points out, the average age of the Louisville team actually increased (from 49.9 to 51.5 years old) after the reduction in force. This increase, though slight, undermines the argument that any of the terminations – including Sharp's – were triggered by a desire to "go younger."

Moreover, even if Sharp had satisfied his prima facie burden, Aker has articulated a legitimate, nondiscriminatory reason for his termination: Aker had decided to retain only two of the four E&I designers, and Sharp had received the second-lowest score in the group on the

- 9 -

forced ranking survey. Sharp claims, however, that the forced rankings were actually a pretext. He argues that the forced rankings are subjective evaluations of employee performance, and therefore have a strong potential to be manipulated to serve discriminatory ends. Sharp notes that "all of the youngest employees" received the highest rankings, and expresses disbelief that Kirkpatrick could receive a score of 7.8 to Ash's 5.6, even though Kirkpatrick was Ash's "protégé." Sharp also argues that the rankings and comments accompanying them are inconsistent.[3]

Again, Sharp's arguments are of little merit. While subjective evaluations do present a higher likelihood of being used to hide discrimination than objective evaluations, *see Grano v. Dept. of Development of City of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983), the alleged inconsistencies Sharp points to here do not indicate that such a problem was present in this case. First, although Kirkpatrick and the 37-year-old scheduler tied for the highest overall score on the forced ranking, the next highest score was received by Ash, who is older than Sharp. In fact, three of the employees Ash out-scored were younger than him, and one was the same age. While not conclusive evidence that the ranking was devoid of discriminatory motives, Ash's performance in comparison to other workers weakens the argument in favor of a pretext.

Second, the fact that Kirkpatrick out-scored Ash does not support a finding of discriminatory animus. It would certainly be possible for a "protégé" to out-perform a "mentor"

---

[3]Specifically, Sharp notes that one piping designer was described as the "most adaptable designer. You can give him [almost] anything and he'll [do] his best to come up with a design that usually works well . . .," but was ranked seventh in the group in the numerical "adaptability" ranking. Sharp also notes that the 58-year-old piping designer who was laid off received the same overall score as his 52-year-old co-worker, and that the 58-year-old received no negative comments, but the 52-year-old received a comment that it was important to "keep him busy or he gets caught up in too much conversation." The 58-year-old designer was laid off, but the 52-year-old designer was not.

in the workplace, and Sharp has offered nothing to show that the fact that Ash scored lower than Kirkpatrick was due to Ash's age. Finally, the "inconsistencies" Sharp points out in the ranking do not support a finding of a discriminatory motive behind the assessment. The connection between the age of the evaluated employee and the alleged inconsistencies is tenuous at best, and Sharp has provided no other evidence to show that the rankings were somehow manipulated to serve a discriminatory motive.[4] Sharp has not presented adequate evidence to support a finding of a pretext, and Aker's motion for summary judgment will therefore be granted.

**CONCLUSION**

Because Sharp has not shown by either direct or circumstantial evidence that age was a motivating factor in his termination, Aker's motion for summary judgment will be granted. A separate order will issue in accordance with this opinion.

---

[4]Sharp also claims that the "impact analysis" document was created after the layoff decisions were made, and that he did not receive his 2008 performance evaluation until after he was laid off. Additionally, Sharp claims that the scores on his 2008 performance evaluation were reduced on Dellinger's directions. It is unclear how either of the first two facts, even if true, would support a finding of discriminatory intent or pretext on Aker's part. Finally, Dellinger stated in deposition testimony that the reductions in the performance evaluation scores for 2008 were made for *all* Louisville Site Team members to bring the evaluations in line with Aker's human resources guidelines. Dellinger Depo. (DN 20-2) at 12. It does not appear that Sharp was in any way "targeted" to have his performance evaluation reduced.